WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-15-01299-001-PHX-GMS |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Ruben Lee Castaneda, | |
| Defendant. | |

Defendant Ruben Lee Castaneda ("Mr. Castaneda") moves to suppress the fruits of a warrantless search and un-*Mirandized* questioning that took place at the scene of his arrest on July 9, 2015.  (Doc. 16.)  Mr. Castaneda also moves to suppress his recorded statements made to El Mirage Police Department ("EMPD") officers during his interrogation at the police station following his arrest.  (Doc. 17.)  The Court held a suppression hearing on July 14, 2016.  For the following reasons, the motions are granted in part and denied in part.

## BACKGROUND

On the morning of June 9, 2015, EMPD Officers Madeya and Lazinsky riding in a patrol car and Officer Chairez riding in a separate patrol car witnessed Mr. Castaneda on a bicycle with a black backpack attached to its handlebars travelling westbound in an eastbound lane of traffic.  Mr. Castaneda then turned down an alley, and walked his bicycle through a hole in a church's chain link fence, set the bicycle against a storage shed, and then spoke with an individual about ninety feet away and out of sight of the

bicycle.  The three Officers convened and determined that Mr. Castaneda's conduct appeared to be an attempt to avoid the Officers; they decided to initiate contact.  Officer Madeya determined his name and discovered that an outstanding valid misdemeanor arrest warrant had been issued against Mr. Castaneda for failing to appear for a prior shoplifting charge.   Officer Madeya arrested and handcuffed Mr. Castaneda on the warrant.

Soon after, Officers Chairez and Lazinsky stated their intent to retrieve Mr. Castaneda's bicycle.  As they were walking away, Officer Lazinsky asked Mr. Castaneda "if there was anything on the bicycle that he needed to know about."  Officer Chairez allegedly heard Mr. Castaneda mention something about a joint; Officer Lazinsky heard no response.  As the two Officers left, Officer Madeya took Mr. Castaneda to his patrol car.  On the way, Officer Madeya allegedly heard Mr. Castaneda mumble that "he found something in the alley," that he thought it was a "rifle or something," and that it had "wood and screws."

When Officers Chairez and Lazinsky arrived at the bicycle, they observed the backpack attached to the handlebars with a brown towel protruding from it; a rope wrapped around the towel was clipped to the handlebars.  Officer Lazinsky, without first procuring a valid warrant to search the backpack, untied the rope, peered inside the towel, and observed what he described as a piece of wood consistent with the stock of a long gun.  The Officers brought the bicycle back to Officer Madeya's location.  Officers Madeya and Lazinsky then pulled the wrapped towel from the backpack, and searched the contents of the towel.  It contained a sawed-off shotgun.

Officers Madeya and Lazinsky transported Mr. Castaneda to EMPD headquarters and began the booking process preparatory to his transfer to the Maricopa County jail.  Part of that process involves inventorying an incoming defendant's property.  (Suppression Hearing, Gov. Ex. 1 at 21.)  The Officers, thus, searched the remainder of the backpack and found, in addition to the shotgun, shotgun shells, drug paraphernalia, and other miscellaneous items.  According to testimony, once inventoried, the Officers

account for the property according to the policies of the EMPD and the Maricopa County jail.  Any personal property that is evidence of a crime is booked by the EMPD into evidence.  Otherwise, some limited items of personal property accompany the defendant to jail, while all other property is held by the EMPD for safe-keeping.  Here, the Officers listed any suspicious property, as well as items prohibited from or too large to accompany Mr. Castaneda to jail (*e.g.*, his backpack), as either "evidence" or "safe-keeping" on an EMPD item submission form.  (Gov. Ex. 3.)  The Officers also recorded the personal items Mr. Castaneda could take to jail on a Maricopa County arrest/booking record. (Gov. Ex. 2.)

At the station, Officers Madeya and Lazinsky questioned Mr. Castaneda.  The interrogation was videotaped.  At the beginning of the questioning, Officer Madeya read Mr. Castaneda his *Miranda* rights off of a card.  When asked if he understood his rights, Mr. Castaneda, with his head down on the table, did not initially respond.  However, upon prompting by the Officers, Mr. Castaneda responded "Yes.  Yes, Sir."  The Officer then asked if, in light of his rights, he wanted to talk.  Again Mr. Castaneda provided an unintelligible initial response, but when prompted, said "yeah."

The interrogation lasted for approximately 30 minutes.  The Officers asked Mr. Castaneda about the shotgun and the drug paraphernalia found in his backpack as well as the statements he made to Officer Madeya allegedly about the shotgun.  After being told that the Officers found a "meth pipe" or "meth" in his backpack, Mr. Castaneda stated: "You got me probably using now."  Mr. Castaneda also, at one point, noted that he had been restoring bicycles "all day long 83 hours."  While at times Mr. Castaneda could recall details about his past and the events leading up to his arrest that day, at other times he only provided seemingly unintelligible answers.

On October 13, 2015, Mr. Castaneda was indicted for being a previously convicted felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

/ / /

- 3 -

**DISCUSSION**

**I.      Physical Evidence Found In Mr. Castaneda's Backpack**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Searches conducted without a warrant "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).  "The burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012) (citation omitted).  The government must prove the exception by a preponderance of the evidence. *See United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987).

The "exclusionary rule—the rule that often requires trial courts to exclude unlawfully seized evidence in a criminal trial—[is] the principal judicial remedy to deter Fourth Amendment violations." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (citation omitted).  The rule excludes both the "primary evidence obtained as a direct result of an illegal search or seizure" as well as "evidence later discovered and found to be derivative of an illegality," otherwise known as the "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984); *see Strieff*, 136 S. Ct. at 2056.  There are exceptions to the fruit of the poisonous tree doctrine; the prosecution has the burden to prove that they apply. *See United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000).

**A.      Inevitable Discovery Doctrine**

The inevitable discovery doctrine provides that if, "by following routine procedures, the police would inevitably have uncovered the evidence, then the evidence will not be suppressed despite any constitutional violation." *United States v. Young*, 573 F.3d 711, 721 (2009) (internal quotation marks and citation omitted).  "The government must make this showing by a preponderance of the evidence." *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000).

/ / /

- 4 -

In *Illinois v. Lafayette*, 462 U.S. 640 (1983), the Supreme Court held it not "unreasonable for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." *Id.* at 648 (internal quotation marks and footnote omitted). Here, the government met its burden to show that under routine procedure, Mr. Castaneda's backpack would have been searched and inventoried at EMPD headquarters thus lawfully revealing the incriminating evidence. The Officers on scene arrested Mr. Castaneda on a valid misdemeanor arrest warrant. Mr. Castaneda was then brought to EMPD headquarters to be processed and booked into Maricopa County jail. Upon booking, the Officers, acting pursuant to routine procedure[1] and EMPD policy inventoried Mr. Castaneda's property. Such an inventory search would have inevitably resulted in discovery of the shotgun, the shotgun shells, and the drug paraphernalia. *See United States v. Andrade*, 784 F.2d 1431, 1433 (1986) (relying on *Lafayette* and holding evidence admissible because the evidence would have been inevitably discovered through an inventory search of an arrestee being booked at a DEA holding facility).

Mr. Castaneda asserts that the EMPD's inventory policy, even as applied to inventory searches of inmates being booked into jail, is unconstitutionally broad under *Florida v. Wells*, 495 U.S. 1 (1990), and thus it cannot "ever" justify opening Mr. Castaneda's backpack. *Wells*, however, does not apply as broadly as Mr. Castaneda asserts and its limited holding is inapplicable here. In *Wells*, an officer conducting an inventory search of an impounded vehicle found and opened a locked suitcase located in the trunk. *Wells*, 495 U.S. at 2. The Court held that whether an officer may open a closed container during an inventory search depended to some extent on the inventory policy providing some guidance so as to not permit "uncanalized discretion" that turns an inventory search into "a purposeful and general means of discovering evidence of crime." *Id.* at 4. *Wells* is inapplicable here for two reasons. First, Mr. Castaneda's backpack was

---

[1] During the Suppression Hearing held on July 15, 2016. Officers Lazinsky, Madeya, and Chairez all testified that it was standard police procedure to inventory the property of an arrestee brought into to EMPD headquarters to be booked into County jail.

not a closed container.  The Officers testified, and exhibits admitted at the suppression hearing substantiate, that the brown towel concealing the shotgun protruded out of Mr. Castaneda's backpack which hung open on the handlebars of his bicycle.  (Gov. Exs. 4, 5.)  The fact is that when the backpack was found, it was found open.  And to the extent Mr. Castaneda asserts that the wrapped towel itself constitutes a closed container, the Court rejects that assertion as unsupported by the facts and authority.

Second, an inventory search of an individual at a police station who is under arrest and being booked into jail is distinguishable from the inventory search of an impounded vehicle being held at an impoundment facility.  As stated above, *Lafayette* governs the circumstances here and holds that regardless of the existence of a sufficient inventory policy, it is reasonable for the police, as part of a routine procedure or practice, to search the possessions of an individual at the stationhouse who is under arrest and being processed for incarceration.  *Lafayette*, 462 U.S. at 645–46; *Andrade*, 784 F.2d at 1434. Such a search is a reasonable procedure because it satisfies the interests of the police "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Bertine*, 479 U.S. at 372.  The *Lafayette* Court held that as to such searches, "every consideration of orderly police administration benefiting both police and the public points toward the appropriateness of the examination" of an arrestee's possessions during booking.  *Lafayette*, 462 U.S. at 647.  Here, it is undisputed that it is a routine procedure for arresting officers to inventory the property of arrestees pending booking at EMPD headquarters and awaiting transfer to Maricopa County jail.  The discovery of the shotgun hanging out of the backpack was thus inevitable in such an inventory search. The inevitable discovery doctrine "requires only that the government show the evidence *would have been discovered* inevitably by *lawful means*."  *Andrade*, 784 F.2d at 1433 n.3.  Accordingly, the shotgun and the ammunition are admissible.

Finally, Mr. Castaneda argues that the inevitable discovery doctrine cannot rely on the Officers' inventory search at EMPD headquarters because the Officers had no reason

to "ever take custody of Mr. Castaneda's backpack" in the first place.  (Doc. 26 at 9.)
This argument is not persuasive.  Officers Lazinsky, Madeya, and Chairez all testified
that prior to making contact with him they witnessed Mr. Castaneda riding his bicycle
with the backpack attached to its handlebars.  Officer Chairez further testified that he
witnessed Mr. Castaneda walk and leave the bicycle leaning against a storage shed on the
church property.  The Officers, thus, knew that the bicycle belonged to Mr. Castaneda or
it at least was recently in his possession.  Nevertheless, Mr. Castaneda asserts that the
Officers should have sought out an individual in the area to take possession of the
property on Mr. Castaneda's behalf before they took possession of it themselves.  To the
extent that such a scenario was even possible, "[t]he reasonableness of any particular
governmental activity does not necessarily or invariably turn on the existence of
alternative less intrusive means."  *See Lafayette*, 462 U.S. at 647 (internal quotation
marks omitted).  Given the facts, the Officers had the obligation to take custody of the
backpack upon Mr. Castaneda's arrest.

　　　　The inevitable discovery doctrine governs the admissibility of the physical
evidence in this case.  Accordingly, the evidence found as a result of the Officers'
inventory search of Mr. Castaneda's backpack upon his booking at EMPD headquarters
is admissible.

## II.     Mr. Castaneda's Statements

　　　　The Fifth Amendment protects an individual's right not to be compelled in "any
criminal case to be a witness against himself."  *Missouri v. Seibert*, 542 U.S. 600, 607
(2004) (citation omitted).  To ensure that right, the Supreme Court in *Miranda v. Arizona*,
384 U.S. 436 (1966) concluded that "the accused must be adequately and effectively
apprised of his rights and the exercise of those rights must be fully honored[.]"  *Id.* at
467.  "*Miranda* conditioned the admissibility at trial of any custodial confession on
warning a suspect of his rights:  failure to give the prescribed warnings and obtain a
waiver of rights before custodial questioning generally requires exclusion of any
statements obtained."  *Seibert*, 542 U.S. at 608.   "The prosecution bears the burden of

proving, at least by a preponderance of the evidence, the *Miranda* waiver . . . and the voluntariness of the confession[.]" *Id.* at 608 n.1 (citations omitted).

### A.   Mr. Castaneda's Statements Made At the Scene of His Arrest

#### 1.   Officer Safety Exception

Officer Lazinsky asked Mr. Castaneda while he was in custody[2] "if there was anything on the bicycle that he needed to know about." The government contends that Officer Lazinsky's question falls within the *Quarles* exception to the *Miranda* requirement. *See N.Y. v. Quarles*, 467 U.S. 649 (1984). The Supreme Court in *Quarles* held that *Miranda* need not "be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Id.* at 656. The test is whether there was "an *objectively* reasonable need to protect the police or the public from any *immediate* danger." *United States v. Brady*, 819 F.2d 884, 888 n.3 (9th Cir. 1987) (emphasis added). Put another way, the Court must determine whether the question was intended to elicit testimonial evidence or was sparked by a pressing need to ensure police and/or public safety. *Id.* at 888.

The government cites three cases in support of its position: *Quarles*, *Brady*, and *Carillo*. Both *Quarles* and *Brady* are too factually distinct to be applicable here. In both cases, the police officers involved asked the defendants about the presence of a gun after arriving on the scene due to the alleged commission of a violent crime. *See Quarles*, 467 U.S. at 651–52 (victim who reported being sexually assaulted warned police that the defendant was carrying a gun); *Brady*, 819 F.2d at 885 (police responded to a report of a man beating a woman and noticed armed gang members in the crowd gathering at the scene). Here, the Officers investigated Mr. Castaneda on their own accord because he allegedly violated a traffic law and seemed to be avoiding police contact. They also did not seek to approach the backpack, which was ninety feet away, until after Mr. Castaneda was under arrest and in handcuffs. No facts about Mr. Castaneda, his conduct, or his

---

[2] The government does not contend that Mr. Castaneda was in custody and had not yet been *Mirandized* at the time of Officer Lazinsky's question.

1    arrest give rise to the same potential threat present in *Quarles* and *Brady*.

2         In the third case cited by the government, *United States v. Carillo*, 16 F.3d 1046

3    (9th Cir. 1994), the police arrested the defendant on drug charges and transported him to

4    a detention facility.  *Id.* at 1049.  Once there, a police officer prepared to search the

5    defendant's person.  *Id.*  Before he began, and before he provided the defendant with his

6    *Miranda* warnings, he asked the defendant whether he had any drugs or needles on his

7    person.  *Id.*  The defendant responded that he did not use drugs, rather he sold drugs; the

8    defendant moved to suppress the statement.  *Id.*  The district court held the statement to

9    be admissible under the *Quarles* exception and the Ninth Circuit affirmed.  *Id.*  The Ninth

10   Circuit looked at three aspects of the interaction:  (1) did the questioning officer face

11   immediate danger, (2) was the question itself non-investigatory in nature, and (3) did the

12   officer cease questioning the defendant or did the officer seek more information.  *Id.*  The

13   court held that during a search of a prisoner, an officer faces the potential immediate

14   danger of contact with syringes and harmful substances.  The court determined that the

15   question was not investigative because it called for a simple "yes" or "no" answer.

16   Finally, the officer only asked the one question even after the prisoner gave an

17   incriminating response.  Thus the court determined that the officer asked the question

18   solely to ensure his own safety.

19        The government contends that like the officer in *Carillo*, Officer Lazinsky asked

20   his question to ensure his safety from immediate danger as he went to "secure and

21   inventory [Mr. Castaneda's] belongings.  [Because t]here are limitless unknown items

22   that could be in an individual's belongings."  (Doc. 18 at 11.)  Such a vague and broad

23   contention of danger falls outside the scope of the *Quarles* exception.  Even in *Carillo*,

24   although the officer did not face the same degree of objective danger faced by the officers

25   in *Quarles* and *Brady*, the officer still faced specific dangers inherent in searching a

26   defendant's person recently arrested on drug charges, *i.e.*, the heightened risk that he or

27   she may be holding drugs or drug paraphernalia in their pockets or other places.  Here,

28   Officer Lazinsky faced no scenario that made a decision to *Mirandize* Mr. Castaneda

before questioning him unreasonable.[3]  *Carillo*, 16 F.3d at 1049.

Further undermining the application of the *Quarles* exception is the nature of the question itself; Officer Lazinsky's question to Mr. Castaneda was vague and investigative.  Asking if there is "anything" Officer Lazinsky needed to know about invites Mr. Castaneda to list specific items of evidence or other incriminating information just as much as it addresses officer or public safety; Mr. Castaneda's alleged answer of a "joint" illustrates this point.  By contrast, in all three cases cited by the government, the officers asked specific questions tailored to determine and ensure their imminent safety given the facts surrounding the encounter.  *Quarles*, 467 U.S. at 652 (After stopping a defendant whom the officer was told had a gun, frisking him and feeling an empty gun holster, the officer then asked the defendant "where the gun was."); *Brady*, 819 F.2d at 885 (The officer responded to a domestic violence call and observed armed gang members in the crowd before asking the defendant "if he had a gun in the car."); *Carillo*, 16 F.3d at 1049 (Before searching the defendant's person after he was arrested on drug charges, the officer asked "if he had any drugs or needles on his person.").  An un-*Mirandized* custodial question intended to evoke testimonial evidence as opposed to a question strictly intended to resolve an officer's objectively reasonable immediate safety concerns cannot be excused by the *Quarles* exception.

The third *Castillo* factor favors the government since Officer Lazinsky only asked one question.  Nevertheless, the government cannot invoke the *Quarles* exception on this record.  Officer Lazinsky's question violated Mr. Castaneda's rights under *Miranda*.  Any alleged response to that question that elicited information about the presence of a joint or finding "a rifle or something" that had "wood and screws" in an alley is suppressed.

---

[3] Another meaningful distinction here is that unlike the officer in *Carillo*, who by policy had an obligation to search the defendant's person upon arrival at the detention facility, *see Carillo*, 16 F.3d at 1049, Officer Lazinsky was under no such obligation. Moreover, unlike the inherent risks of a needle prick or other exposure when searching an individual, Officer Lazinsky could have secured the backpack in a way that avoided contact with it thus relieving whatever tenuous safety concerns he may have had.

- 10 -

### 2.    Spontaneous Statements Exception

Next the government contends that Mr. Castaneda's mumbled statements made in Officer Madeya's presence as Mr. Castaneda was being led to Officer Madeya's patrol car constitute spontaneous remarks not protected by *Miranda*.  The government cites *People v. Mickey*, 818 P.2d 84 (Cal. 1991), a California Supreme Court case, to support its position that "*Miranda* . . . does not 'prohibit the police from merely listening to . . . voluntary, volunteered statements uttered by a person, whether or not in custody, and using them against him at the trial."  *Id.* at 100 (citing *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)) (internal quotation marks omitted).  In *Mickey*, detectives *Mirandized* the defendant who invoked his right to counsel.  *Id.* at 100.  Nevertheless, the defendant, while being transported from Tokyo, Japan to Honolulu, Hawaii, voluntarily began speaking to detectives who never engaged in "express questioning" at any point before or during the flight.  *Id.*  The Court could not discern "any custodial interrogation within the meaning of *Miranda*" and accordingly ruled the statements admissible since without a custodial interrogation, "*Miranda* simply does not come into play."  *Id.* (internal quotation marks omitted).

The facts here differ.  Officer Lazinsky's investigatory question to a handcuffed and arrested Mr. Castaneda constitutes a custodial interrogation under *Miranda*.  A very short time, if not immediately after Officer Lazinksy posed the question and walked away to retrieve Mr. Castaneda's bicycle, Officer Madeya led Mr. Castaneda to his patrol car. On the way, Mr. Castaneda made three comments related to his bicycle and the contents of his backpack.  The government argues that because Officer Madeya did not ask Mr. Castaneda any questions, those comments were spontaneous and voluntary like the comments in *Mickey*.  Yet in *Mickey*, at no point in time did any officer pose any investigative question related to the defendant's alleged crime; rather the defendant, after hours of contact with the detectives, eventually began divulging incriminating details. The Court found no proximate cause between anything a detective did or said and the defendant's statements.  Here, however, a very short period of time passed between

Officer Lazinsky's question and Mr. Castaneda's comments.  Further, Mr. Castaneda's comments related to Officer Lazinsky's question.  The fact that Mr. Castaneda made those comments in Officer Madeya's presence and not to the questioner does not somehow make them spontaneous and apart from the custodial interrogation.

Because the Officers never apprised Mr. Castaneda of his *Miranda* rights, use of the comments against Mr. Castaneda would violate his Fifth Amendment rights, thus they are inadmissible.

### B.    Mr. Castaneda's Recorded Statements Made During His Interrogation at EMPD Headquarters

An individual may waive his or her *Miranda* rights "provided [that] the waiver is made voluntarily, knowingly and intelligently."  *See Miranda*, 384 U.S. at 444.  "There is a presumption against waiver," however, "which the Government bears the burden of overcoming by a preponderance of the evidence."  *United States v. Crews*, 502 F.3d 1130, 1139–40 (9th Cir. 2007) (citation omitted).  "To meet this burden, generally, the Government must prove that, under the totality of the circumstances, the defendant was aware of the nature of the right being abandoned and the consequences of such abandonment."  *Id.* at 1140.  When analyzing the totality of the circumstances, Courts typically consider a number of factors including "(i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system."  *Id.*  As to mental capacity, intoxication can preclude voluntariness if it reaches the level of incapacitation that it subverts the defendant's intellect and overcomes his or her free will.  *See, e.g.*, *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989).

/ / /

/ / /

/ / /

Mr. Castaneda asserts that he had a diminished mental capacity during the period of interrogation[4] due to methamphetamine intoxication and related exhaustion such that he could not have understood his *Miranda* rights nor could he have legally waived them. There is no direct evidence that Mr. Castaneda was under the influence of methamphetamine during his interrogation; nevertheless, Mr. Castaneda argues that "[a]vailable evidence tends to indicate that Mr. Castaneda is a consumer of methamphetamine, and the statements made by Mr. Castaneda as well as his observed behavior during the interview are consistent with the symptoms of methamphetamine use." (Doc. 27 at 3.) Mr. Castaneda's demeanor while the Officers read him his *Miranda* rights and throughout the interrogation is not reflective of someone so intoxicated or of such diminished mental capacity that he is no longer able to exercise his intellect or free will. While the Officers did find a used methamphetamine pipe in his backpack, and Mr. Castaneda did, at one point, suggest that the Officers may have caught him using and that he may have been working all day for 83 hours, such facts are insufficient in light of the totality of the circumstances to invalidate his waiver. *Crews*, 502 F.3d at 1140.

The majority of the *Crews* factors are present here. After Officer Madeya read him his *Miranda* rights, Mr. Castaneda affirmatively acknowledged understanding his rights and then affirmatively agreed to proceed with the interrogation. His rights were read to him in English and there is no indication that English was not his primary language. Mr. Castaneda also has prior experience with the criminal justice system. Moreover, mental capacity is also only one factor; thus, even if the Court were to assume, based on the circumstantial evidence, that Mr. Castaneda was intoxicated to some degree, the facts do not evidence a level of intoxication overriding the other factors. Finally, throughout the interrogation, Mr. Castaneda, amongst other things, recalled details about the past day, articulated specifics about where he allegedly found the gun, and expressed

---

[4] The government provided the Court with a DVD recording of Mr. Castaneda's interrogation via a notice submitted to the Clerk's Office on June 10, 2016.

that he understood that as a previously convicted felon he could not possess a firearm. And to the extent that many parts of his responses were indecipherable to someone listening to the recording, the indecipherability seems to be caused by low talking or a poor recording and not jumbled or nonsensical speech indicative of intoxication. Given those circumstances, Mr. Castaneda's waiver of his *Miranda* rights was voluntary, knowing, and intelligent and his subsequent statements are therefore admissible.[5]

## CONCLUSION

For the foregoing reasons, Mr. Castaneda's motions to suppress are granted in part and denied in part.

**IT IS HEREBY ORDERED** that:

1.      Mr. Castaneda's Motion to Suppress Evidence (Doc. 16) is **GRANTED** in part and **DENIED** in part.

2.      Mr. Castaneda's Motion to Suppress Defendant's Statements (Doc. 17) is **DENIED**.

Dated this 22nd day of July, 2016.

Honorable G. Murray Snow
United States District Judge

---

[5] Mr. Castaneda argues that even if he waived his *Miranda* rights and thus his interrogation was lawful, the Officers induced his admissions regarding the shotgun by confronting him with unlawfully seized evidence; thus under the "fruit of the poisonous tree" doctrine, his admissions must be suppressed. The "doctrine applies . . . when the fruit of the Fourth Amendment violation is a confession." *Oregon v. Elstad*, 470 U.S. 298, 306 (1985). Because the Court ruled above that the physical evidence found in Mr. Castaneda's backpack is admissible under the inevitable discovery doctrine, Mr. Castaneda's alternative point is moot.